All case please. Case number 3-16-05-25, consolidated with case number 3-16-07-22. Katara, LLC and Gray Tribe, LTD, appellants cross-appellees by Lenny Asaro v. Ann Schneider as Secretary of the Department of Transportation, appellee cross-appellant by Amanda Ripper. Please proceed. Counsels, opposing counsel, justices, opposing counsel, my name is Lenny Asaro and I'm the attorney for the appellant Katara, LLC and Gray Tribe, LTD. This case is about, one, the government taking of an additional part of a private property owner's property for a road widening project and the government's refusal to pay just compensation under the Constitution and continuing to refuse to pay just compensation, developing various theories as to why Katara does not own the property. And number two, this case is about a property owner who, in accordance with the correct legal standard, proved beyond any reasonable doubt that it owns the additional property that was taken by IDOT. Katara respectfully requests and prays that this court, one, reverses the decision of the trial court ruling in favor of IDOT and against the property owner, and two, hold that Katara proved that it is the owner of the property, the additional property in this case, in accordance with the correct legal standard that was not applied, and three, that this court order the trial court to enter an order of mandamus requiring IDOT to pay just compensation for the additional property that it took. The reasons for Katara's request are, one, the trial court simply did not apply the correct legal standard, the legal standard that this court set forth in the Roots decision with regards to resolving a dispute about the legal description of property and ownership. Had the court applied the correct legal standard, the application of that rule to the words contained in the deed, the legal description itself, revealed that the northeast property line for the Katara property is 511 feet northeast of the northeast line of Route 113 in Braidwood, Illinois. The legal description in the deed revealed that the southeast property line is 200 feet southeast of the center line of the railroad main track. That is what the legal description describes. The northeast property line they described as the center line of vacated Oak Street, and the dimensions within the deeds, there's two parcels, parcel one and parcel two that are contiguous, show that those are the property lines according to the legal description. In this particular case, it started in 2004. IDOT's surveyor, Ronald Hodgen, started his survey work. He went out to various properties in Braidwood with regard to this road widening project. What he did was he staked. He left markings on various properties that were going to be part of the taking for the road widening project. Shortly after that, in 2005, Hodgen completed his plat of highway. Plat of highway is not a survey. It just shows the right of way and the properties from which property will be taken to widen the roads. In this particular case, the subject property is at the corner of Route 113 and Route 53. If I may beg the indulgence of the court, Route 113 is also called Main Street, and Route 53 is also called Front Street. I'm going to try to just use Route 113 and Route 53 throughout our argument just in the economy of words. The subject property is located at that corner. Hodgen completed his plat of highway. His plat of highway shows that the northeast property line is 480 feet northeast of the northeast line of Route 113. His plat of highway shows that the property's southeast property line is 200 feet southeast of the center line of the railroad tracks. His plat shows that an area comprised of 175 feet by 25 feet, the northeast part of the property, is not part of Katara's property. If I might, Your Honor, I listened to the audio in Chicago titled Land Trust versus Bolingbrook, which this court heard oral arguments on October 24, 2017. In that case, the issue had to do with annexation. I believe one of the justices actually brought up one of the maps, and they were discussing it and holding it. What I did was I brought – these were all marked in evidence. They're all exhibits in evidence. These are the plats of highway that were prepared by IDOT's surveyor. This area here, which on the exhibit, which is Katara Exhibit 86-A-C-72, is the so-called disputed area. It's about, like I said, it's 175 feet by 25 feet. Just so that this court has some perspective, Ottawa Township High School is just down the road. An end zone is approximately 160 feet by 30 feet. So we're talking about almost an end zone-sized strip, which is at the back of this property, which, by the way, there were 11 parking spaces in that area, and then there was some landscaping right along Route 53. It is in this landscaping area, which is where the area of additional taking is. So after Hodgin completed his plat of highway, approximately a few months later in 2005, Katara was on the verge of purchasing the property – again, the whole property is Parcel 1 and Parcel 2 – from the prior owners, the estate of Dorothy Testa. They closed on the purchase in 2005. At the closing, Katara received a survey prepared by Joseph Gentile. It's an ALTA survey, certified. The ALTA survey contains the full, complete legal description contained in the deeds that Katara received. And by the way, the deeds that Katara received were prepared by the Grand Tours attorney, John Treynor. And the legal description in the deeds are the exact legal description contained in the deeds from 1975 when the railroad company, who owned most all of this land along the railroad there in 113, started conveying various parcels to individuals between 1975 and, I believe, in the 1980s. They started disposing of land. So the legal description is contained in the Gentile survey. And his survey shows that the Northeast property line, which the legal description, and this is important, because under the rule of law in Roots, if the court is to construe the words in the legal description itself and nothing else, not consider anything else in resolving a dispute over ownership of property. The legal description in this case for Parcel 1 says it starts at a point of beginning. The point of beginning being two intersecting lines. One of those lines, it says, is 200 feet southeast of the center line of the railroad track. That line has been identified. There's no dispute as to where that line is, and it's shown in the Hadgen survey and the Gentile survey, or Hadgen-Platt and the Gentile survey. The legal description then goes on to say the other line is the center line of vacated Oak Street. Now, the trial court repeated those words in its decision, but it did not go on to state the other words that followed the words center line of vacated Oak Street. The legal description indeed specifically says center line of vacated Oak Street per the 1967 Braidwood Ordinance. So when you go to the 1967 Braidwood Ordinance, which is part of the legal description by reference, the 1967 Braidwood Ordinance says Braidwood vacates that part of Oak Street in the John H. Daniels subdivision between the railroad line and Route 53. So that leads you to another recorded document, which is the John H. Daniels Platthouse subdivision. The John H. Daniels Platthouse subdivision is evidence that John Daniels owned all of the land. This is also an exhibit. Qatar Exhibit 17-A is the John H. Daniels Platthouse subdivision. All of the land here is the land owned by John Daniels. The area in blue is the area that he conveyed to the railroad company in 1867. So what's important about the Daniels Platthouse subdivision is that, again, it's in the record, there is no description on that plaque of an Oak Street in that area. You've all seen that plaque. It looks visually to be an opening. Nor does the plaque contain any language whatsoever stating that Daniels is dedicating any land or street. And that's really important because when you look at the legal description, it refers to an ordinance vacating Oak Street from 1967. And then you go to the Daniels Platt and you don't see a street. You don't see any words in that area saying street and you don't have any words stating that he's dedicating the street. Then the logical thing is to start to question and scratch your head and go, well, okay, what do we do? Well, what do we do is that in 1867 when Daniels, when this Platthouse subdivision was created, five days later Daniels conveyed the property, Block 11 in blue, to the railroad company. And that deed, which is in the record, describes the land that Daniels has conveyed. And he conveyed all of that land and described it as the land between the blocks, Block 7 and 8, Block 8 and 9, and 9 and 10. And then in that deed, and counsel will argue her interpretation of it, but in that deed it identifies, it says areas on the southeast side as street. And it has the word street in there, okay? But again, the Platt did not dedicate any streets. It just has the word street. On the northwest side, it doesn't contain any words that show street. Again, the Platt does not contain any language of a dedication. So five days after the Platt is created, Daniels conveys all this land to the railroad company. So now the railroad company owns all the area in blue, most importantly for this case, Parcel 1 and Parcel 2, which is McHarris' property. And Parcel 1 contains the disputed area, which contains the area of additional taking. Between 1867, I'm sorry, in September of 1867, when Daniels conveyed the land to the railroad company, a year later, a year later is when the Daniels Platt subdivision was recorded. The reason why that's important is because the Platt Act, which we correctly cited in our brief, states, most importantly, that one of the elements of a valid dedication would be that it has to be recorded. So even on this theory that Daniels conveyed those areas that are not labeled street, assuming that the language is in there of a dedication, and assuming he dedicated it, it would have been an invalid dedication because he had already conveyed the simple interest to all of that land to the railroad company. So from 1867 all the way until 1975, there is no evidence that anybody ever disputed who owned what as it relates to Parcel 1 and Parcel 2. The railroad company owned that land uninterrupted from 1867 to 1975. And the land I'm talking about now is Parcel 1 and Parcel 2, which is the subject of this case. In 1975, the railroad company conveyed Parcel 1 to John and Dorothy Tesla. And in that legal description, they describe the property as starting at those intersection points that I mentioned. An intersection starting at a line that's 200 feet southeast of the centerline of the railroad track, which they also said was the Route 53 right-of-way line. And then it said the other line is the line that is the centerline of vacated Oak Street per the 1967 Braidwood Ordinance, which by the way, the Braidwood Ordinance contained no drawing, no survey, no description, a legal description of the purported Oak Street that was vacated. Nothing. Two minutes, counsel. Sure. So, then the legal description says, then from that point, 380 feet southwest. Then it says to a point 175 feet northwest. Then to a point 380 feet northeast. Then to a point southeast to the point of beginning. 380 feet is the measurement along Route 53. Parcel 2, the railroad company conveyed about a month after the railroad company conveyed Parcel 1 to Tesla. And in that legal description, the point of beginning starts down on Route 53. I'm sorry, Route 113 by the railroad track. And then it says from that point of beginning, it goes northeast, 131 feet. Then it goes southeast to Route 53. And then southwest, 131 feet. And then back up northwest, 175 feet, point of beginning. The dimensions in the legal description show that from Route 113 northeast for Parcel 2, it's 131 feet. Then Parcel 2, the legal description says it goes 380 feet. 380 plus 131 is 511 feet. That was identified as the centerline of vacated Oak Street, not just by Joseph Gentile who did the survey, but the railroad company who conveyed the property to the Testas and to the adjacent property owner, Parcel 2. The language is indeed expressing that they're conveying all of that land, all of it, Parcel 1 and Parcel 2. And they wrote the legal description when they conveyed the property to Testa and the other property owner. And John Treynor used the exact same legal description. And this is the John Treynor who's retired now, but he prepared the legal description. And then the title company endorsed the survey that was prepared by Joseph Gentile. In this case, what it comes down to is out of all that evidence that we presented consistent with the law that says you can only look at the legal description, we proved beyond any reasonable doubt, through the legal description, through the plats, through the chain of title, through the history, that Katara and Katara's predecessors owned this property. He and the prior owner paid taxes on this property. He and the prior owner maintained this property. Katara presented evidence of receipts that he paid landscaping companies to maintain the area of additional taking. But when Katara discovered that IDOT had taken this property, and the only reason why he discovered it is because IDOT decided to make an issue about what the whole property was in the case by disclosing that they would call Hodgin to say that Gentile is wrong. Even though every single one of IDOT's experts based their valuation opinions on, guess what, a whole property consistent with what is shown in the Gentile survey, even though they didn't have the Gentile survey. They overlooked the fact that Hodgin excluded the disputed area, which had 11 pro parking spaces in it, and its landscaping. Thank you. Thank you. Thank you. May it please the Court, Counsel, Your Honors. My name is Amanda Rip, and I represent the Department of Transportation and Schneider, the Secretary of the Department, who is the athlete and cross-appellant in this case. Because the Secretary was sued in her official capacity, I will refer to her as IDOT, if that's okay. There are three issues before this Court. One, whether or not the Circuit Court's ruling denying the mandamus was against the manifest rate of the evidence, whether the Circuit Court's ruling denying IDOT's sanction motion was an abuse of discretion, and whether the Circuit Court properly interpreted the term cost under the Mandamus Act correctly. Because the ruling on the mandamus and the sanction motions are interrelated, I'm going to discuss those at the same time. Mandamus is an extraordinary remedy, which means, in this instance, when it's used to compel a condemnation complaint, the petitioner, your qatar, must be the clear and unequivocal owner of the property at issue. If there is any question asked of that ownership, mandamus is not viable, and the request must be denied. It is impermissible to litigate ownership in a mandamus case, which is what happened here and why the mandamus was properly denied and why the case should never have been filed. The Circuit Court correctly found that it denied Qatar's mandamus because it found that Qatar did not own the property at issue, which we are calling the arid additional taking, for two independent reasons. First, it was not a part of Qatar's property per its deed. And second, it was located within a pre-existing right-of-way. In fact, the Circuit Court went on to note that the evidence, when taken as a whole, suggested that Qatar was not, in fact, the owner of the arid additional taking. If a court finds that a party's own evidence negates its cause of action, I think the lying belt should go off. I think it's evidence that the case was not filed in good faith. The arid additional taking is a green space area that's 10 by 25 feet located behind the grocery store on Route 53. In order to bring the mandamus, Qatar's legal description had to include this area. Qatar's legal description identifies its rear property line as the, quote, center line of vacated Oak Street per Ordinance No. 67-18. The reference to the center line is what is known as a monument call because it refers to something that you can locate in the field. Another monument call could be railroad tracks. And because it can be found in the field, the law requires that if there is a dispute and a discrepancy in the legal description between a monument call and the dimensions, the monument call will control. This is the law that was set forth in Kleinfelter and Flick. Therefore, there is no reason to go beyond the terms of the deed and determine the intent of the properties. The intent is determined by the reference to the monument. Also, this was the undisputed evidence before the circuit court. Both land surveyors testified at trial that the center line controlled the designation of the rear property line for the Qatar property. Qatar's argument that this circuit court should ignore the law that monuments control and instead determine de novo the railroad's intent from a document that was borrowed from evidence, which was Exhibit 49, should be disregarded. The law is clear that monuments control the location of property lines, and Qatar states no case law to review this rule of law. The Lutz case is not a case about a monument issue. Because the center line designation controlled the location of Qatar's property, the area of additional taking had to be located south of the center line in this case. When Qatar purchased the property, it received an off-the-serve bail from Joe Gentile, and it showed that the area of additional taking was, in fact, located south of the center line. However, five years later, in 2010, Qatar received IDOT's plan of highways. And IDOT's plan of highways has the center line located in a different place. It's 25 feet further south than Gentile shows and closer to the building. And what this shows, importantly, is that the area of additional taking is not part of Qatar's property. So in July of 2010, when Qatar receives IDOT's plan of highways, it prepares a package of information and sends that to Joe Gentile, their land surveyor. And in that package is IDOT's plan of highways, I think other documents, but importantly is the adjacent property's deed, which is the polka dot's property. And that's the only property that is adjacent to this property, because otherwise this property is surrounded by tracks, Route 113, and Route 53. So after getting this information, IDOT takes the deposition of Joe Gentile in December of 2010. At his deposition, Gentile testifies that he thinks the survey may be wrong, because when he prepared his survey, he did not have the deed to the polka dot's property. He further testified that now having reviewed that document, he may have located his center line in the incorrect place. And he further said it may be, in fact, located 25 feet further south, closer to the grocery store building. Now this statement was surprising, because it meant that IDOT's location of the center line and its plan of highway was correct, and that the area of additional taking was not located within Qatar's property. Now having just learned that your land surveyor has made a major mistake like that, I think it would cause any regional person to stare at that survey and investigate it. And had any regional person done that, they would have seen that not only was the area of additional taking maybe not on the center line, it was located within an existing right-of-way. Joe Gentile's survey showed that the area of additional taking was located in what he identified as the, quote, northwesterly line of Front Street as monumented. Now it's not uncommon that private property is encumbered with right-of-way. And when that happens, the owner's rights to that land are inferior to the rights of the highway, as long as that area was used as highway for about 15 years. In this case, the area identified by Gentile as the northwesterly line of Front Street as monumented had been used as right-of-way for over 15 years. There was not only a visibly worn and old right-of-way marker in the area inscribed with the letters ROW, there were utilities in the area as well as a highway junction sign for Route 113. And that was in line with several other highway signs that were located along Route 53 and located within the area designated by Gentile as the Front Street as monumented. And in this case, the evidence showed that all of those improvements had been installed more than 14 years before this case had been filed. So after 2010 and Gentile's deposition, a regional person would have realized that there were not one but two issues with the ownership of your area of the additional taking. But Katara disregarded that evidence because it thought it could gain title to the area of additional taking by changing the recorded legal description by removing the reference to the centerline of vacated Oak Street. Katara thought it could remove references to the centerline by claiming that Oak Street was never dedicated. So in April of 2011, Katara sent IDOT me a letter maintaining that Oak Street was never dedicated. In this letter, Katara transcribes the deed that John Daniels, who again is the original subdivider of the area, that he executed with the railroad. The actual words in that deed are as follows. Quote, there are four crossings or streets with a capital S are to be left open and free to witness files and then it goes on from there to identify the locations of the streets that were to be left open and free. By the way, one of those streets is Route 113. But when Katara transcribed that deed in its letter to IDOT, it removed the words or streets by inserting ellipses. By removing those words or streets, Katara attempted to hide the fact that Daniels intended to dedicate the street. Katara also then misrepresented the terms of the Daniels plaque. I haven't seen the exhibit, but if it's the same one than I think, that exhibit is trying to remove a space that exists between blocks 10 and 11 on the Daniels plaque. Because on the Daniels plaque, there appears to be a space. And a space is evidence of a dedicated street. Now Katara not only used these manipulated documents with me, IDOT, the circuit court in the eminent domain case, it then later used it in this case. But before it even used it in this case, it used it with Chicago Title. It used those documents with Chicago Title to try to convince Chicago Title to rewrite the legal description. So on May 4, 2011, Katara contacts Chicago Title and provides it with this incorrectly transcribed deed between Daniels and the railroad. Katara then tells Chicago Title that based on this deed, Oak Street was never dedicated and then forced Chicago Title, you should rewrite the legal description and remove any reference to the centerline. Now the representative of Chicago Title investigated Katara's claim, disagreed with his conclusion about Oak Street, and refused to rewrite the legal description. Now at this point, after failing to get the legal description revised and knowing your own land surveyor has testified under oath that he has doubted out his own survey, an original person would have conducted additional research about the location of the centerline and the depiction of the right-of-way on the survey, on Gentile's survey. And here, the additional research would have been very simple and easy. If Katara had researched the public records, it would have found a bland new dedication from 1921. And that would have corroborated and supported Gentile's depiction of the right-of-way on his survey. Also, Katara's title policy had a survey endorsement. That meant he could make a claim under his policy and get a new survey at no cost to himself. Rather than do this, he decided to file this case, attach Gentile's survey, and rely upon it for its allegations that it owned the area of additional taking. And he did that when knowing that Gentile donned its own survey. And by the way, these stats did not disappear at trial. The facts got worse. Because during discovery, four more surveys and IDOT's land surveyor testified that we agree with the depiction of Gentile's right-of-way. We agree. The circuit court then found that Joe Gentile could not, he conceded, he could not locate the centerline. He then, the circuit court, then relied upon IDOT's land surveyor. And he described IDOT's land surveyor as, quote, substantially more reliable than Gentile. Not only did he survey the area from Route 113 to the section line on both sides of Route 53, he had testified he could certainly locate the location of the centerline. And if that evidence wasn't enough for the circuit court, then the evidence that Katara tried to change the legal description was. And if that evidence was enough, the circuit court found that it was absolutely clear that the area of additional taking was located within an existing right-of-way. Now having found this evidence, when it came to IDOT's motion for sanctions, the circuit court ignored this evidence. The evidence that the circuit court found was that Katara, before it even filed this case, had attempted to change its legal description, knew its survey, doubted its own survey, and knew the area of additional taking was in right-of-way. How could then the circuit court find that Katara had a reasonable basis to file this action? The law is, if the denial of the sanctions does not logically follow from the facts, appellate courts will find there is an abuse of discretion and it will reverse that ruling. Here, there was no logical connection. When denying IDOT's motion for sanctions, the court said it was a close case, which makes no sense given what he had found in its order denying mandamus. Rule 137 is intended to prevent frivolous lawsuits. No reasonable person would have filed this mandamus knowing what Katara knew and given what Katara did. Attempting to persuade Chicago Title to change your recorded legal description is evidence of Katara's direct knowledge it lacked the right to mandamus. These are not honest mistakes, but instead evidence demonstrating Katara's actual knowledge it did not own the area of additional taking and its utter disregard for that evidence. This court is not required to turn a blind eye to these facts. It can look at this case and figure out whether this case is worthy of sanctions. And if this case, given these facts, is not worthy of sanctions, then Rule 137 has no meaning. This court should affirm the denial of the mandamus, but reverse the ruling on the denial of the sanctions. With respect to the cost, this court can review that de novo. And it's IDOT's position that the cost in the Mandamus Act should be cost incurred. And you can say that it's supposed to be cost incurred because the term cost is given to both the successful plaintiff and the successful defendant. And here, the plaintiff is to be made whole in the mandamus. It gets damages and costs. And it wants to be made whole, and it can only be made whole if all the plaintiff's costs are then recovered. Here, the successful defendant should also be rewarded those costs. It, too, should be made whole because by making it whole, the taxpayers are made whole. And it's okay to make the taxpayers whole because the taxpayer should not have to pay for its public official doing its duty correctly and having a mandamus filed that was denied. And in this case, the Eminent Domain Act also supports IDOT's position. And Qatar does not dispute this. It, too, agrees that the Eminent Domain Act, and given the similarity between the Eminent Domain Act and the Mandamus Act, that that would apply. And the Eminent Domain Act says that costs incurred are to be recovered. So it appears that Qatar and IDOT are agreeing that if there's a successful plaintiff, he certainly would have gotten the costs that he incurred. In this case, because the term cost is the same in the Mandamus Act for defendant and plaintiff, so, too, should the State of Illinois get its costs that it incurred. So in this case, we're asking this Court to reverse the trial court's ruling that only awarded $200 of IDOT's $11,283.02 of costs. We're asking you that it should award all those costs because IDOT incurred it. And IDOT incurred it after litigating a five-year baseless mandamus action. The Circuit Court cited to no evidence that supported Qatar's cause of action. Thank you. May it please the Court. Counsel argued that Vacated Oak Street was a monument and that it actually existed. Washington Street exists. You can drive right down it. That's a monument. Someone can walk out to Washington Street, and they can see that Washington Street is actually there. In this case, the trial court stated in the record to me when I was cross-examining Hajat about the existence of this Vacated Oak Street, the trial court said, I think we can all agree that there is no evidence, physical evidence, of a Vacated Oak Street. Not one shred of evidence in the record, not a photograph, nothing to demonstrate that Oak Street actually existed. It's only based on the 1967 Braidwood Ordinance. But there's no description in there. There's no plaque of vacation. There's no drawing. There's nothing. Unlike the other documents that are in the record. The 1993 easement that the railroad company gave to the State of Illinois for part of this property. Right there at Route 113 and Route 53. That's in the record. And there's a map showing exactly where the easement area is. The buildings Vacated Oak Street, there's nothing. There is absolutely nothing. There is no evidence that this Vacated Oak Street actually existed. There's an Oak Street on the southeast side, where there's houses on both sides, but there is no street. So there is no monument. Was part of the description left out of some of your exhibits? Absolutely not. And I'd like to address, is that the associate? Absolutely. So counsel stated that in the letter that I sent to her, explaining that we own this property and that I attached. I, so this is against me. That I attached the railroad company, the Daniels Railroad Company deed. Okay? I wrote the letter and I attached the actual document itself. I didn't hide anything. I wrote the letter and said, read the legal description. The legal description says, and it identifies, and it's right there in the record, it says, keep open crossings opposite of streets. That's what the language says. When counsel says that I manipulated, I didn't cross out anything in the recorded document. That's not what she's asserting. She's asserting that me writing to her and explaining what the deed says and including the deed itself, that I manipulated the document and misrepresented something to her. That is totally and utterly false. It's utterly false. She may disagree with her interpretation of what the deed says, but I provided her with the entire deed. Second, counsel stated that Gentile testified at his deposition in the Emmett Domain case, that he was wrong and that Gentile was right. That is totally and absolutely false. I would direct this court to the record. See 1841. See 1841. And see 1843, when Gentile was specifically asked, he testified at the deposition in the Emmett Domain case, which is what counsel is referring to. Gentile testified that he would not rewrite his survey to show the northeastern line of property line would be 25 feet southwest of it. He testified that for the time being, he would leave his northeasterly property line where it is on his survey. He testified that he would show a line 25 feet southwesterly because of the polka dots deed. This is important. They are relying on the polka dots deed because the polka dot deed is part of the Chicago Enrollment and Coat Company, Platt of Subdivision. You didn't hear them say anything about justifying how Hodgin could rely on the wrong subdivision. The Chicago Enrollment and Coat Company, Platt of Subdivision is not part of the legal description at all. So under the correct legal standard, only the legal description and what's referenced in there could be relied upon. Hodgin relied on the Chicago Enrollment and Coat Company, Platt of Subdivision. And then Gentile testified that he would continue to show on his survey that the property line fits with the dimensions. He testified that the polka dot deed goes to the line consistent with the location of the northeasterly line of Vacated Oak Street Children on his survey. There's a reason why I got an in-trial court when they filed their motion, did not cite to the Gentile deposition transcript. When we brought it up in our response, they didn't cite it in their reply, and they didn't cite it in front of Judge Rickman. The reason why is because the statements that he testified that his survey is wrong is absolutely and completely, utterly false. And I would refer this court to the record at C-1840 through C-1843. Those are the pages of his deposition testimony. And then finally, with regard to the Blandy dedication, and I can't cover all these points, the Blandy dedication. In Blandy, on one hand, IDOT states that Daniels dedicated this land as part of a street. Well, if Daniels dedicated this land as part of a street in 1867, how could Blandy in 1920 dedicate land that was already dedicated by Daniels? And by the way, Blandy owned the properties northeast of this area. And Hodgkin testified at trial that he could not find a single document in the record to prove that there was a dedication of the area, the disputed area, and the area of additional taking therein. IDOT did not come up with this idea or theory about them having a right-of-way line in this area until the Mandamus case. I'm sorry, until we filed the Mandamus case. I would just like to respond to a couple of allegations. First of all, counsel misunderstands what a monument call is, okay? A monument call doesn't necessarily have to be something physically found. It can be something that can be found because it's platted on a subdivision plaque that provides for its location. And what's shocking is that counsel is up here actually saying to this court that the C&W plaque does not apply to this property. It's located in the C&W plaque. And its legal description actually does refer to it because the only way you know where Oak Street is is if you look at the C&W plaque. So, and that is not the evidence before the circuit court. Both land surveyors testified. I agree it was never improved, Oak Street, on the northeast side of Route 53, but that doesn't mean I can't locate it. Joe Gentile repeatedly said, just like Ron Hodgins, I can locate it. It's findable in the field. I may have found it. I could be wrong. That's what he said. And the polka dot deed is important not just because it's the adjacent property, but it's important because that deed identified the location of the northeasterly line of Oak Street. That corroborated the dimensions in the C&W plaque. So, all of this information is what a land surveyor would use that Gentile didn't use because he didn't get the polka dot deed. He didn't know that when the polka dot deed was created, Oak Street was not vacated. He didn't know that because when Oak Street was vacated, the polka dot deed never changed its legal description to inquire the north half of Oak Street. And that's why when everybody else went to survey this property, including Gentile, he saw where the polka dot was occupying the property and just assumed that was the center line. But that assumption was wrong. And that's what Gentile admitted to. Let's go to the letter that counsel sent to me. This is Exhibit 41, so it's in the record. What was transcribed in that letter was a glitzes that remove oars streets. Now, I will agree counsel was nice enough to give me a copy of that deed, but it was illegible. It was from 1853 or 57. I couldn't read it at all. So I relied upon his transcription to me in a letter. And it wasn't until after getting ready for trial that my land surveyor blew it up, because he had the capacity to do it, that I saw the words oar streets with a capital S. Now, if you use a capital S for street, I'm pretty sure your intent is to make that a public street. But the legal status of oar streets is not important, because you can find it in the field because it was platted on a subdivision plot. And I'm sure he misunderstands the Blandy dedication. The Blandy dedication is not significant because of oar street. It's significant because of the location of Route 53. That dedication and its terms match the location of the right-of-way marker found in the field inscribed with ROW. And then when you go to the ordinance that vacated Oak Street, it will clearly say in that ordinance, we are not vacating that which is located within the right-of-way of Route 53. That is not vacated. So when you have a survey, a monument, and you have an ordinance that's telling you that Route 53 right-of-way is not being vacated in Oak Street, I think you better go do some research. And had you done that, you would have found the Blandy dedication. So this whole issue about what happened in the eminent domain case, yes, the state of Illinois was like, we don't want to leave a date on your shed. We will value the property as you want. But we are not going to agree you own it because we don't think you own it. And rather than accept all the evidence before it, he just revoted it. When you have two competing surveys and you know yours may be wrong, you don't get a survey. And in this case, you could have gotten one for free. You could have gotten one on Chicago Tiles time. So if sanctions, if that will is to have any meaning, it has to have meaning in the case where you knowingly file a cause of action and try to manipulate the evidence. Because when you go and try to change your recorded legal description that impacts your neighbor, I think you know you don't own the property. And you should not come in the eminent domain case and sue the state of Illinois, particularly when you know that it's working within its own right-of-way. And what's the only additional taking? There is no improvement of Katara's. It's only the state of Illinois's. It's IDOT's junction sign, it's the right-of-way marker, and it's permitted utilities. And thank you. Anything else? We'll take a break now. Thank you.